# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

GOODWIN & GOODWIN, INC.,     )
an Arkansas Corporation,      )
                               )
      Plaintiff,        )
                               )     Case No. CIV-21-19-TDD
v.                           )
                               )
NEEL, HARVELL AND ASSOCIATES, P.C., )
an Oklahoma Corporation, and    )
AERO-MOD, INC., a Kansas Corporation,   )
                               )
      Defendants.      )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 25 and 26, 2023, the Court conducted a bench trial of the issues presented for decision in the Final Pretrial Report in this matter. *See* [Doc. No. 52]. Plaintiff and Counterclaim-Defendant Goodwin & Goodwin, Inc., appeared through attorney Matthew Horan and corporate representative Bryan Goodwin. Defendant Neel, Harvell and Associates, P.C., appeared through attorney J. Patrick Mensching and corporate representative Scott Neel. Defendant and Counter-Claimant Aero-Mod, Inc., appeared through attorney John D. Lackey and corporate representative Robert Mahan. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows.

### *Background*

This dispute arises out of the construction of a wastewater treatment plant ("Plant") in Pocola, Oklahoma. In 2013, the City of Pocola engaged Neel, Harvell and Associates ("NHA"), an engineering firm specializing in wastewater treatment plant design, to design

a new Plant. During the course of its design, NHA consulted with Aero-Mod, a wastewater equipment supplier, regarding equipment and electrical aspects of the Plant.

After NHA completed its initial design plans in 2018, the City of Pocola solicited bids for the new Plant's construction. Ultimately, Goodwin & Goodwin ("G & G") was selected to serve as the project's general contractor. G & G executed a contract with Aero-Mod for the purchase of equipment to be installed at the Plant, and broke ground on the project in August of 2018.

Between March and August of 2019, G & G poured and formed the Plant's tank walls to a height of twenty-two feet. After constructing the tank walls, G & G discovered that the equipment it purchased from Aero-Mod was only compatible with eighteen-foot, as opposed to twenty-two-foot, tank walls. As a result of this discrepancy, G & G reduced the height of certain tank walls from twenty-two to eighteen feet.

G & G seeks to recover from Aero-Mod and NHA for the losses it allegedly incurred while revising the tank walls. It asserts claims for negligence and breach of contract against Aero-Mod, as well as a negligence claim against NHA. Aero-Mod has alleged breach of contract and negligence counterclaims against G & G. The claims are within the Court's jurisdiction pursuant to 28 U.S.C. § 1332.

### *Findings of Fact*

1.      The City of Pocola solicited bids for the construction of its new Plant in the Spring of 2018. The bid advertisement was distributed on March 5, 2018, and all bids were due by April 19, 2018. Aero-Mod also distributed a draft purchase order to the general

contractors interested in bidding on the project. By doing so, Aero-Mod proposed selling certain equipment for installation at the Plant.

2.      The scope of services to be provided by the general contractor were based on the design plans created by NHA. The structural portion of NHA's plans included a "hydraulic profile" which depicted, *inter alia*, the Plant's top and bottom tank-wall elevations. The bottom elevation was 407 feet, and the top elevation was 429 feet, equating to a tank-wall height of twenty-two feet. *See* Pl.'s Ex. 2 at 4.

3.      During the bidding period, NHA distributed a "notice to bidders," which altered certain design specifications. Specifically, the notice stated:

> The Drawings for the [Wastewater Treatment Plant Improvements] shall be and are hereby amended as follows:
> ***
> Sheets 30 & 32: Air piping supply and details (revisions from Aero-Mod). See attached drawing.

Pl.'s Ex. 5 at 1 ("Addendum No. 2"). The attached drawing reflects revised tank-wall heights of eighteen feet, as opposed to the twenty-two-foot walls depicted in the hydraulic profile. Addendum No. 2 is dated April 10, 2018, and is signed by NHA's project manager, Scott Neel.[1] Although Bryan Goodwin testified that an engineer typically approves project revisions, he also testified that Addendum No. 2 expressly altered the project's specifications.

4.      Upon reviewing the bid package and submitting its bid, G & G was selected to serve as the general contractor for the project. After it was selected, it signed two

---

[1] Scott Neel is not a certified engineer.

contracts: one with the Pocola Municipal Authority, and another with Aero-Mod for the purchase of equipment for installation at the Plant. *See* Pl.'s Ex. 6, 7.

5.      The contract between G & G and the Pocola Municipal Authority is dated effective May 29, 2018. The contract specifies that Pocola Municipal Authority retained NHA to act as its representative in connection with the completion of the Plant. *See* Pl.'s Ex. 6 at 44. By signing the contract, G & G represented that it "examined and carefully studied the Bidding Documents," including Addendum No. 2, which depicts eighteen-foot tank walls. Pl.'s Ex. 6 at 22.

6.      The contract[2] between G & G and Aero-Mod was executed by G & G's president, Bryan Goodwin, on June 8, 2018. The contract states that "[t]he following scope of services is based upon the latest plans and specifications prepared by Neel, Harvell & Associates sealed February 23, 2018." Pl.'s Ex. 7 at 2. It also provides: "As noted before, this scope of supply is based upon the referenced drawings. Should any changes be made to the plans that will affect this scope of services, then Aero-Mod reserves the right to adjust this scope appropriately." Pl.'s Ex. 7 at 11.

7.      The contract required submittals[3] to be sent by email to NHA's project manager, Scott Neel. It also specifies that "[d]elivery [of equipment] may be within 20 weeks of receipt of approved submittal drawings. Allow six (6) weeks for drawing

---

[2] The contract also included a choice of law provision, which states: "This offer and any related confirmation or contract of sale shall be governed by and construed in accordance with the laws of the State of Kansas." Pl.'s Ex. 7 at 14.

[3] Submittals are drawings or diagrams which illustrate some portion of the work to be performed.

submittal after receipt of purchase order." Pl.'s Ex. 7 at 10. The contract further states that "Aero-Mod will provide the detailed plan/construction submittal drawings in a timely manner to assure proper and timely construction." *Id.*

8.     In an email dated June 27, 2018, Robert Mahan, Aero-Mod's vice president and regional sales manager, wrote to Bryan Goodwin:

> There were many changes during the design of this project and confusion is to [be] expected. Our recommendation will be to build from our approved submittal drawings because they will be most consistent with the intended design. Changes will have no [e]ffect on the construction other than the locations of [] some wall inserts and piping. As soon as submittals are complete, we will send them out for review.

Pl.'s Ex. 8 at 1-2. Mahan testified that, although a change in tank-wall height constitutes a change in construction, at the time he emailed Bryan Goodwin, he understood that NHA's plans had been amended—by virtue of Addendum No. 2—to reflect eighteen-foot, as opposed to twenty-two-foot, tank walls.

9.     Aero-Mod finalized its submittals in late July of 2018. Consistent with Addendum No. 2, the submittals depicted eighteen-foot tank-walls. *See* Aero-Mod's Ex. 10. These submittals were electronically transmitted, via email, to Scott Neel on July 25, 2018. *See* Aero-Mod's Ex. 9. Alex Peterson, Aero-Mod's assistant project manager, testified that she also mailed hard copies of the submittals to G & G's office in early August. *See also* Aero-Mod's Ex. 11 (email from Scott Neel to Bryan Goodwin stating that the submittals were mailed August 1, 2018).

10.     On August 6, 2018, Aero-Mod's project manager, Robert Retzlaff, followed up with Bryan Goodwin, via email, and stated: "[b]y now you should have submittals to look at." Aero-Mod's Ex. 12. Bryan Goodwin did not respond.

11.     Retzlaff again followed up with Bryan Goodwin on September 17, 2018, regarding the status of the submittals. *See* Aero-Mod's Ex. 13 ("I'm following up about the status of the submittals for Pocola, do you have anything back at this time?"). Bryan Goodwin did not respond to Retzlaff's email, but did forward the email to G & G's project manager, David Garcia.

12.     On October 9, 2018, Alex Peterson emailed Bryan Goodwin and Scott Neel "to find out the status of the submittals [Aero-Mod] sent out for approval." *See* Aero-Mod's Ex. 15. Peterson testified that her email included links to Aero-Mod's submittals. Using Aero-Mod's computer system, Peterson was able to determine which parties accessed the submittals through the electronic links. She testified that there is no indication that Bryan Goodwin accessed the submittals via the electronic links.

13.     Later that day, David Garcia emailed Peterson and stated that the submittals "[l]ook[] to be approved." Aero-Mod's Ex. 16. Garcia attached a document to his email which indicated that Aero-Mod's submittals were both "[a]pproved as noted" and "[a]pproved as submitted." *Id.* Garcia copied Bryan Goodwin on his email to Peterson.

14.     In her response to Garcia, Peterson explained that "Robert Retzlaff is trying to determine what is meant by the 'approved as noted' comment, [as] no comments are shown." Aero-Mod's Ex. 17. Retzlaff also emailed Bryan Goodwin, stating "[p]er emails I've seen this morning Pocola Submittals have been 'Approved as Submitted' and

'Approved as Noted.' Are there notes or comments we need to be aware of, can you send them to me?" Aero-Mod's Ex. 18.

15.    Garcia responded to Peterson and clarified that the "approved as noted" comment was accidental. Aero-Mod's Ex. 20. Garcia testified that, as of October 11, 2018, Aero-Mod's submittals—which depicted eighteen-foot tank walls—were approved without modification. Bryan Goodwin testified that he was aware that Garcia[4] approved Aero-Mod's submittals in October of 2018.

16.    Although Garcia indicated to Peterson that the submittals had been approved without modification, both Garcia and Bryan Goodwin testified that they never received a complete set of submittals from Aero-Mod and, thus, were unaware that Aero-Mod's equipment was only compatible with eighteen-foot tank walls.

17.    NHA's project manager, Scott Neel, did receive and review Aero-Mod's submittals. He testified that, at the time he reviewed Aero-Mod's submittals, he discovered that the wall height depicted in Aero-Mod's submittals differed from the wall height depicted in the structural portion of NHA's initial plans. He also testified that he did not, at any point, alert G & G or Aero-Mod to the discrepancy.

18.    Throughout 2019, construction progressed on the Plant; between March and August, G & G poured and formed the Plant's tank walls to a height of twenty-two feet. A representative from NHA, K.D. Harvell, inspected the Plant's worksite almost daily during the pendency of the project, while Scott Neel visited the Plant's worksite more than once

---

[4] Bryan Goodwin also testified that David Garcia had authority to act on G & G's behalf.

per week. Despite frequently inspecting the site, Scott Neel never informed G & G that the Plant's tank walls, as constructed, did not conform to Aero-Mod's submittals.

19.     Aero-Mod scheduled a site visit[5] at the Plant for August 29, 2019, to discuss equipment install with G & G. On August 28, 2019, Scott Neel sent an email to Jim Beer, a consulting engineer representing Aero-Mod, stating: "Can you contact AeroMod . . . AeroMod drawing shows 18', NHA drawing shows 22', a difference of 4'." *See* Aero-Mod's Ex. 34. To this point, Aero-Mod was unaware that G & G constructed twenty-two-foot tank walls.

20.     After the discrepancy was discovered, the parties collaborated and created a plan to revise the height of the tank walls, as necessary, to ensure compatibility with Aero-Mod's equipment. G & G agreed to modify the Plant's tank walls in accordance with the revised set of plans. Bryan Goodwin testified that these revisions delayed the project by three months.

21.     Aero-Mod submitted its final invoice for $55,097.45 to G & G on June 17, 2020. Bryan Goodwin testified that G & G did not pay the invoice because, in his view, Aero-Mod breached the parties' contract.

22.     As it relates to payment, the contract between Aero-Mod and G & G provides:

> Payment in full is due within thirty (30) days from the invoice date. In the event payment is not made when due, [G & G] agrees to pay [Aero-Mod] a service or finance charge of one and one-half percent (1.5%) per month (18%

---

[5] Bryan Goodwin testified that the contract between Aero-Mod and G & G did not require Aero-Mod to visit or inspect the Plant's worksite at any point prior to its equipment being installed.

per annum) on the unpaid balance of the invoice from and after the invoice
due date.

Pl.'s Ex. 7 at 12. The contract also provides that "100% of retainage [is] due upon project's

Substantial Completion." *Id.* at 10. Bryan Goodwin testified that the Plant reached

substantial completion on August 4, 2020.

23.     On August 4, 2020, G & G submitted an invoice to Aero-Mod in the amount

of $153,320. The invoice purports to reflect the costs incurred by G & G to revise the

Plant's tank walls. *See* Pl.'s Ex. 22. Aero-Mod did not pay the invoice.

## *Conclusions of Law*

## I.     Breach of Contract

The basis of G & G's breach of contract claim against Aero-Mod is that Aero-Mod

failed to supply equipment compatible with the twenty-two-foot walls depicted in the

structural portion of NHA's initial design plans. Aero-Mod's breach of contract

counterclaim is based on G & G's refusal to pay Aero-Mod's June 17, 2020, invoice. For

the reasons that follow, the Court finds that Aero-Mod did not breach its contract with

G & G. The Court further finds that G & G is liable to Aero-Mod for breach of contract.

### a.  Aero-Mod, Inc.

The Court first addresses G & G's breach of contract claim against Aero-Mod. To

recover for breach of contract under Oklahoma[6] law, a party must establish: "(1) formation

---

[6] As noted, the contract between G & G and Aero-Mod states that the contract "shall be
governed by and construed in accordance with the laws of the State of Kansas." *See* Pl.'s
Ex. 7 at 14. In their proposed findings of fact and conclusions of law, the parties offer no
choice of law analysis. In fact, Aero-Mod, in its proposed findings and conclusions, states:
"The parties have agreed to utilize Oklahoma law, rather than Kansas law, for purposes of

of a contract; (2) breach of the contract; and (3) damages as a result of that breach." *Morgan v. State Farm Mut. Auto. Ins. Co.*, 2021 OK 27, ¶ 21, 488 P.3d 743, 748 (citing *Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843). To determine whether either party is liable for breach of contract, the Court must analyze the contract and "give effect to the intent of the parties at the time the contract was formed." *Mercury Inv. Co. v. F.W. Woolworth Co.*, 1985 OK 38, ¶ 9, 706 P.2d 523, 529. When analyzing a contract, it "must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." *Id.*

There is no dispute that the purchase order dated June 8, 2018, constitutes a valid contract between G & G and Aero-Mod. The contract governed the purchase of certain equipment for installation at the Plant, and provides that the "scope of services is based upon the latest plans and specifications prepared by Neel, Harvell & Associates sealed February 23, 2018." Pl.'s Ex. 7 at 2. The contract also states that "[d]elivery [of equipment] may be within 20 weeks of receipt of approved submittal drawings. Allow six (6) weeks for drawing submittal after receipt of purchase order." Pl.'s Ex. 7 at 10. Additionally, the contract required Aero-Mod to "provide the detailed plan/construction submittal drawings in a timely manner to assure proper and timely construction." *Id.* Pursuant to the contract, Aero-Mod's submittals were to be emailed to Scott Neel.

---

the claims by Plaintiff against Aero-Mod and contractual counterclaim by Aero-Mod." Aero-Mod's Prop. Find. & Conc. [Doc. No. 76] at 12. Because there is no substantive difference between Kansas and Oklahoma law in this context, the Court applies Oklahoma law.

It is apparent that the parties' intent, under the contract, was for the purchase and delivery of equipment for installation at the Plant. As of June 8, 2018—the day that Bryan Goodwin executed the contract on behalf of G & G—NHA's plans had been partially amended, vis-à-vis Addendum No. 2, to reflect eighteen-foot tank walls. Indeed, Bryan Goodwin testified that Addendum No. 2 expressly altered the project's drawings and specifications.[7] Robert Mahan also testified that, as of June 2018, he understood that NHA's plans were amended to reflect eighteen-foot tank walls to ensure compatibility with Aero-Mod's equipment.

Upon review of the contract between G & G and Aero-Mod, and in light of the trial testimony related to NHA's revised construction plans, the Court finds that that the contract required Aero-Mod to deliver equipment compatible with eighteen-foot, as opposed to twenty-two-foot, tank walls. The evidence showed that the tank-wall revision was effective, by virtue of Addendum No. 2, prior to June 8, 2018, the day that Bryan Goodwin executed the contract on behalf of G & G. Further, the equipment supplied by Aero-Mod was compatible with eighteen-foot tank walls. Thus, Aero-Mod's performance under the contract comported with the latest version of the plans prepared by NHA. Accordingly, the Court concludes that Aero-Mod did not breach its contract with G & G.

Even absent Addendum No. 2's incorporation, the Court finds that Aero-Mod did not breach its contract with G & G. As noted, the parties' contract required Aero-Mod to

---

[7] Additionally, Bryan Goodwin, testified that he reviewed Addendum No. 2, which reflected eighteen-foot tank walls. *See also* Pl.'s Ex. 6 at 22 (G & G representing, in its contract with Pocola Municipal Authority, that it "examined and carefully studied the Bidding Documents," including Addendum No. 2).

deliver equipment "within 20 weeks of receipt of approved submittal drawings." Pl.'s Ex. 7 at 10. The submittals were to be sent, via email, to Scott Neel "in a timely manner to assure proper and timely construction." *Id.* The evidence showed that Aero-Mod furnished its submittals to Scott Neel—via email, as required under the contract—on July 25, 2018.[8] Scott Neel testified that he reviewed the submittals upon receipt. To ensure compatibility with Aero-Mod's equipment, the submittals depicted eighteen-foot tank walls. Although Bryan Goodwin testified that he never received or reviewed Aero-Mod's submittals, he also testified that he was aware, as of October of 2018, that G & G's project manager, David Garcia, approved the submittals proposed by Aero-Mod. According to Bryan Goodwin, Garcia was authorized to act on G & G's behalf.

After G & G finished constructing the tank walls in August of 2019, Aero-Mod scheduled a site visit to discuss equipment installation with G & G. Shortly before the site visit, Aero-Mod was alerted that G & G failed to construct eighteen-foot tank walls—in accordance with the approved submittals—and instead poured and formed twenty-two-foot tank walls. Although this discrepancy initially rendered Aero-Mod's equipment unusable, the Court finds that Aero-Mod performed in accordance with the terms of its contract with G & G. It timely delivered submittals, as required under the contract, to Scott Neel for review. After several follow-up attempts, on October 11, 2018, Aero-Mod received confirmation from G & G's project manager, David Garcia, that the submittals were approved. No evidence was presented that Aero-Mod failed to "provide the detailed

---

[8] In addition, it mailed hard copies of the submittals to G & G's office. *See, e.g.* Aero-Mod's Ex. 11.

plan/construction submittal drawings in a timely manner to assure proper and timely construction." Pl.'s Ex. 7 at 10. The evidence showed that, after the submittals were approved, Aero-Mod supplied the equipment as required under the contract. The evidence also indicated that Aero-Mod's equipment comported with the specifications set forth in the approved submittals, as it was ultimately integrated into eighteen-foot tank walls.

In summary, the Court finds that Aero-Mod's equipment was compatible with the design specifications set forth in Addendum No. 2—which, at the time the contract was signed, was incorporated into NHA's plans—as well as the submittals approved by David Garcia in October of 2018, five months before G & G began constructing the Plant's tank walls. For these reasons, the Court concludes that Aero-Mod did not breach its contract with G & G.

### b.  Goodwin & Goodwin, Inc.

The Court next addresses Aero-Mod's breach of contract counterclaim against G & G. As noted, Aero-Mod's counterclaim is based on G & G's failure to pay the balance set forth in Aero-Mod's final invoice. The contract between Aero-Mod and G & G provides:

> Payment in full is due within thirty (30) days from the invoice date. In the event payment is not made when due, [G & G] agrees to pay [Aero-Mod] a service or finance charge of one and one-half percent (1.5%) per month (18% per annum) on the unpaid balance of the invoice from and after the invoice due date.

Pl.'s Ex. 7. Under the contract, "100% of retainage [is] due upon project's Substantial Completion." *Id.* at 10. According to Bryan Goodwin, the Plant reached substantial completion on August 4, 2020.

Bryan Goodwin testified that G & G did not pay the $55,097.45 invoice amount. In light of the Court's finding that Aero-Mod fully performed in accordance with the parties' contract, the Court concludes that G & G, by failing to pay the June 17, 2020 invoice, is liable for breach of contract in the amount of $87,253.73. This amount is comprised of the $55,097.45 invoice amount, plus contractual pre-judgment interest in the amount of $32,156.28.

## II.    Negligence

Next, the Court addresses G & G's negligence claims against Aero-Mod and NHA, as well as the negligence counterclaim alleged by Aero-Mod. G & G argues that Aero-Mod's failure to inform G & G that its equipment was incompatible with the twenty-two-foot tank walls depicted in the structural portion of NHA's initial design plans requires a finding that Aero-Mod acted negligently. Turning to NHA, G & G asserts that NHA's project manager, Scott Neel, failed to alert G & G that it was constructing tank walls contrary to Aero-Mod's submittals, despite his knowledge of the same. Finally, the basis of Aero-Mod's negligence counterclaim against G & G is that G & G failed to seek clarification regarding the discrepancies between Aero-Mod's submittals and the structural portion of NHA's initial design plans prior to constructing the tank walls. Aero-Mod argues that G & G's error required it to perform additional work outside the scope of the parties' contract. For the reasons that follow, the Court is unable to conclude that any party is liable for negligence.

### a. Neel, Harvell and Associates, P.C.

Negligence claims require the (1) existence of a duty, (2) breach of that duty, and (3) injury and damages directly resulting from the defendant's breach of its duty. *See, e.g., Dirickson v. Mings*, 1996 OK 2, ¶ 7, 910 P.2d 1015, 1018; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, ¶ 13, 37 P.3d 783, 788. Under Oklahoma law, "the existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking." *Wofford v. E. State Hosp.*, 1990 OK 77, ¶ 19, 795 P.2d 516, 519. A court must determine "whether a defendant stands in such a relationship to a plaintiff that the defendant owes an obligation of reasonable conduct for the benefit of the plaintiff." *Delbrel v. Doenges Bros. Ford, Inc.*, 1996 OK 36, ¶ 7, 913 P.2d 1318, 1320-21. "Whenever the circumstances attending a situation are such that an ordinarily prudent person could reasonably apprehend that, as the natural and probable consequences of his act, another person will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises." *Wood v. Mercedes-Benz of Okla. City*, 2014 OK 68, ¶ 7, 336 P.3d 457, 459-60 (quoting *Weldon v. Dunn*, 1998 OK 80, ¶ 11, 962 P.2d 1273, 1276).

Several years before it sought bids for its new Plant, the City of Pocola consulted with NHA regarding the Plant's design. After NHA completed its design plans, the City of Pocola solicited bids for the construction of its new Plant in the Spring of 2018. The services to be provided by the project's general contractor were based on the plans developed by NHA. NHA served as the City of Pocola's representative in connection with the completion of the Plant. *See* Pl.'s Ex. 6 at 44.

After G & G was selected as the project's general contractor, G & G entered into a contract with Aero-Mod which required Aero-Mod to email its submittals to Scott Neel, NHA's project manager. The Court heard testimony from Neel that he received, reviewed, and ultimately approved the submittals, which indicated that Aero-Mod's equipment was only compatible with eighteen-foot tank walls. According to Neel's testimony, he was aware that Aero-Mod's submittals depicted tank-wall heights which differed from the structural portion of NHA's initial design plans. During the pendency of the project, NHA employees, including Neel, frequently inspected the Plant's worksite. Despite inspecting the worksite more than once per week, Neel never notified G & G that it was pouring and forming tank walls which were inconsistent with Aero-Mod's submittals.

NHA, as the consulting engineer for the Plant, owed G & G a duty to exercise reasonable care during the pendency of the project. As discussed, the evidence showed that Scott Neel was aware that Aero-Mod's equipment was only compatible with eighteen-foot walls, as reflected in the submittals. Although Neel inspected the Plant's worksite at least once per week, he never informed G & G that the walls, as constructed, failed to conform to the approved submittals. As a result, G & G was initially unable to install Aero-Mod's equipment at the Plant. By failing to communicate to G & G that G & G was constructing tank walls in a manner contrary to Aero-Mod's submittals, NHA breached its duty of care.

Having found that NHA breached its duty of care, the Court turns to the issue of damages. To be awarded compensatory damages in a negligence cause of action, a plaintiff must prove, by a preponderance of the evidence, that its "injury and the resultant damages were *directly* the result" of the defendant's failure to perform its duty. *Stroud*, ¶ 13, 37 P.3d

at 788 (emphasis in original). Next, it must "adduce evidence establishing the amount of compensatory damages which [it is] due." *Id.*

At trial, the Court heard testimony from Bryan Goodwin regarding an invoice that G & G submitted to Aero-Mod. *See* Pl.'s Ex. 22. The invoice, dated August 4, 2020, purportedly reflects the costs incurred by G & G to revise certain portions of the Plant's walls. Having found Aero-Mod is not liable to G & G in contract or, as set forth *infra*, in negligence, G & G's assertion that it is entitled to the damages set forth in the invoice addressed to Aero-Mod fails. It is unclear whether G & G effectively asserted at trial that such damages were *also* incurred as a result of NHA's negligence. Nevertheless, the Court will address the alleged damages to the extent they may relate to NHA.

Mr. Goodwin testified concerning each line item included in the invoice. First, Mr. Goodwin discussed the line items related to the rental value of G & G's crane and scissor lifts. G & G seeks compensation in the amount of $42,000 for the rental value of its crane, and $27,000 for the rental value of its scissor lifts, during the period of delay caused by the wall-height discrepancy. *See id.* Notably, neither the crane, nor scissor lifts, were used to revise the Plant's walls. Nevertheless, Mr. Goodwin testified that he was prevented from using the crane and scissor lifts on other projects, specifically, a drainage project in Fort Smith. Given that the crane and scissor lifts were not utilized to make the necessary revisions to the Plant, it is unclear why G & G was prevented from utilizing this machinery at nearby job sites.[9]

---

[9] Further, Mr. Goodwin testified that, when asked during the course of discovery to produce documents supporting his claim that he was unable to use the crane and scissor lifts at other

As detailed in its invoice, G & G also seeks damages related to the following costs it allegedly incurred due to the wall-height revision:

| | |
|---|---|
| Remove & Reinstall Cat Walks | $17,500 |
| Remove & Reinstall Ras Trough | $4,000 |
| Effluent Holes Wrong Elevation $3,000/EA x 4 holes | $12,000 |
| Influent Holes Wrong Elevation $3,000/EA x 3 holes | $9,000 |

*See* Pl.'s Ex. 22. After hearing Mr. Goodwin's testimony, the Court is unable to discern whether these claimed additional expenses directly flowed from the revisions made due to the wall-height discrepancy. Specifically, it is unclear whether the ras trough and cat walks were installed at the Plant as of the time the discrepancy was discovered, which would obviate the need for their removal and subsequent reinstallation. Mr. Goodwin's testimony was similarly inconsistent regarding when the effluent and influent holes were drilled. Based on Mr. Goodwin's testimony and the case record, the Court cannot conclude that any nexus exists between NHA's breach and the aforementioned costs which G & G allegedly incurred.

Turning to the remaining costs set forth in the invoice, Mr. Goodwin was asked, during cross-examination, whether these costs were primarily related to labor or equipment. He testified that some of the costs were equipment related, while others accounted for labor. Although Mr. Goodwin testified that he had access to documents supporting these costs, aside from its one-page invoice, G & G failed to introduce any such documents at trial in support of its claim that it suffered damages. During trial, Mr.

---

projects, he chose not to. *See* Aero-Mod's Ex. 67 at 9. He also admitted that, when asked during his deposition about other projects at which he was unable to use this equipment, he failed to mention the Fort Smith drainage project.

Goodwin further admitted that he deliberately chose not to provide these documents to Aero-Mod during discovery, despite Aero-Mod's request.[10] Thus, the only evidence supporting G & G's claim for damages is Mr. Goodwin's trial testimony related to G & G's August 4, 2020 invoice, and that evidence fails to preponderate.[11]

In light of Mr. Goodwin's inconsistent trial testimony, and absent any supporting documentation from G & G, the Court is unable to conclude that G & G has proved, by a preponderance of the evidence, that it suffered damages as a direct result of NHA's breach of its duty of care. Accordingly, the Court finds that NHA is not liable for negligence. *See Stroud*, ¶ 13, 37 P.3d at 788.

### b. Aero-Mod, Inc.

Unlike NHA, Aero-Mod was unaware—prior to August of 2019—that G & G poured and formed the Plant's tank walls contrary to Aero-Mod's approved submittals and Addendum No. 2. Aero-Mod was not contractually obligated to inspect or visit the site.[12] Although Robert Mahan testified that he was aware that NHA's initial design plans required twenty-two-foot tank walls, he also testified that he understood that these plans were effectively amended by virtue of Addendum No. 2, as well as the approved submittals.

---

[10] To this end, Aero-Mod has filed a Motion for Sanctions. *See* [Doc. No. 75]. By its motion, Aero-Mod requests that the Court dismiss G & G's claims against Aero-Mod or, in the alternative, strike all testimony related to G & G's alleged damages.

[11] Additionally, Mr. Goodwin testified he submitted a request for payment, in the amount of $110,722.00, to City of Pocola as a result of the wall-height revisions. *See* Aero-Mod's Ex. 56. According to Mr. Goodwin, the City of Pocola paid G & G the entirety of the requested amount.

[12] Indeed, in contrast to NHA, Aero-Mod did not visit the worksite at any point prior to late August of 2019.

Thus, although Aero-Mod was aware that its equipment was only compatible with eighteen-foot tank walls, Aero-Mod had no reason to believe that G & G was not constructing walls of this height; Addendum No. 2 was incorporated into NHA's design plans, and Aero-Mod's submittals were approved several months before construction on the tank walls began. Further, after furnishing its submittals for review, Aero-Mod followed up numerous times with both G & G and NHA to ensure that its submittals had been received, reviewed, and approved prior to construction. Accordingly, the Court finds that Aero-Mod cannot be held liable for negligence.

### c. Goodwin & Goodwin, Inc.

Although the issue of G & G's negligence presents a close question, the Court also finds that Aero-Mod has not proven, by a preponderance of the evidence, that G & G was negligent. As noted, the basis of Aero-Mod's negligence claim against G & G is that G & G failed to seek clarification regarding any discrepancy between Aero-Mod's submittals and NHA's initial plans. Although Alex Peterson, Aero-Mod's assistant project manager, testified that she mailed the submittals to G & G, it is unclear whether G & G actually reviewed the submittals. Upon review of the evidence and the case record, the Court is unable to conclude that G & G was aware of the discrepancy caused by the conflicting directives between Aero-Mod's submittals and the structural portion of NHA's initial plans. The evidence showed that the only party clearly aware of the discrepancy, with a duty to act on that knowledge, was NHA. Accordingly, the Court is unable to find that G & G's failure to seek clarification regarding the discrepancy between Aero-Mod's

submittals and the structural portion of NHA's initial design plans requires a finding that G & G acted negligently.

Moreover, even if the Court were to conclude that G & G was negligent, Aero-Mod's evidence of damages was scant, at best. With only the most general testimonial support, the evidence regarding Aero-Mod's alleged damages set forth in Aero-Mod's Exhibit 59 fails to preponderate.

### *Conclusion*

For the reasons stated herein, the Court finds, by a preponderance of the evidence, that Goodwin & Goodwin breached its contract with Aero-Mod. The Court further finds that (1) Aero-Mod did not act negligently or breach its contract with Goodwin & Goodwin, and (2) neither Neel, Harvell and Associates, nor Goodwin & Goodwin, is liable for negligence.

**IT IS THEREFORE ORDERED** that Aero-Mod is entitled to a judgment against Goodwin & Goodwin in the amount of $87,253.73.

**IT IS FURTHER ORDERED** that Aero-Mod, Inc.'s Motion for Sanctions [Doc. No. 75] is **DENIED AS MOOT.**

**IT IS SO ORDERED** this 31st day of July, 2023.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE